UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>ANTHONY MARSICO, ARTHUR P. PIZZELLO, JR., ROBERT QUATTROCCHI, AND TIMOTHY CAREY,<br><br>Defendants. | Civil Action No.: 25-cv-553<br><br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") files this Complaint against Defendants Anthony Marsico ("Marsico"), Arthur P. Pizzello, Jr. ("Pizzello"), Robert Quattrocchi ("Quattrocchi"), and Timothy Carey ("Carey") (collectively, "Defendants"), and alleges as follows:

## SUMMARY

1. This case concerns unlawful insider trading by Defendants Marsico, Pizzello, Quattrocchi, and Carey in the stock of Goodness Growth Holdings, Inc. ("Goodness Growth") in advance of a February 1, 2022 announcement by Verano Holdings Corporation ("Verano") that it was acquiring Goodness Growth in an all-stock transaction valued at approximately $413 million (the "Announcement").[1]

---

[1] On October 14, 2022, Verano publicly announced the termination of its planned acquisition of Goodness Growth.

1

2. In the wake of the news, Goodness Growth's stock skyrocketed. On the day of the Announcement, Goodness Growth's share price rose by nearly 42%.

3. Goodness Growth and Verano operated retail dispensaries and marijuana growth facilities in several states. In 2021, Verano – headquartered in Chicago – was actively working on entering into the coveted New York state retail cannabis market. At the time, Goodness Growth had one of only ten licenses to cultivate and sell cannabis in New York state.

4. During the relevant period, Marsico, Pizzello, Quattrocchi, and Carey were close friends, and they all resided in the suburban Chicago area. They were all members of the same country club, which Pizzello co-owned. They also regularly called and texted each other, and they regularly golfed, gambled, and socialized together.

5. Marsico, an Executive Vice President at Verano at the time of the conduct alleged herein, knew Verano was interested in expanding into the New York retail cannabis market, and he learned that Goodness Growth was looking to be acquired. By December 2021, through Marsico's employment as an executive of Verano, he had learned that Verano was planning to acquire Goodness Growth.

6. In late December 2021, Marsico told Pizzello about the planned acquisition of Goodness Growth by Verano. Pizzello then immediately told Quattrocchi about the planned acquisition. In early January 2022, Pizzello also told Carey about the planned acquisition.

7. Between December 8, 2021 through January 31, 2022, Marsico, Pizzello, Quattrocchi, and Carey each purchased thousands of shares of Goodness Growth stock based on material nonpublic information about the planned acquisition.

8. At the close of the market on the day of the Announcement, Marsico had unrealized gains totaling $661,549, Pizzello had unrealized gains totaling $124,456, Quattrocchi

had realized and unrealized gains totaling $28,136, and Carey had unrealized gains totaling $9,260, from their insider trading.

9. By engaging in the conduct alleged herein, Marsico, Pizzello, Quattrocchi, and Carey each violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

10. The Commission brings this action seeking: (1) a permanent injunction against Marsico, Pizzello, Quattrocchi, and Carey; (2) an officer-and-director bar against Marsico; (3) disgorgement of ill-gotten gains with prejudgment interest against Marsico, Pizzello, Quattrocchi, and Carey; (4) civil penalties against Marsico, Pizzello, Quattrocchi, and Carey; and (5) any additional relief that the Court deems just and proper.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa]. Marsico, Pizzello, Quattrocchi, and Carey have, directly or indirectly, made use of means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange, in connection with the transactions, acts, practices, and courses of business alleged herein.

12. Venue in this Court is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Marsico, Pizzello, Quattrocchi, and Carey all reside in the Northern District of Illinois. Also, certain of the acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred within the Northern District of Illinois.

**DEFENDANTS**

13. **Anthony Marsico**, age 39, resides in Bartlett, Illinois. Marsico was employed at Verano from October 2018 until January 22, 2024, when he was terminated. Marsico held various positions at Verano and co-owned a forerunner entity that was subsumed by Verano in 2018. During the relevant period, Marsico was an Executive Vice President at Verano and was responsible for municipal government relations and real estate, which included responsibility for acquiring the proper licenses and approvals to open cannabis dispensaries in various jurisdictions.

14. **Arthur P. Pizzello, Jr.**, age 61, resides in Wayne, Illinois and Marco Island, Florida. From July 1985 to November 2004, January 2007 to November 2008, and June 2009 to November 2024, Pizzello was associated with several broker-dealers and investment advisers registered with the Commission. From August 2014 through March 2022, he was a registered representative associated with a broker-dealer registered with the Commission. During the relevant period, Pizzello held Financial Industry Regulatory Authority ("FINRA") Series 6 and 63 licenses, which he voluntarily surrendered on November 5, 2024. Pizzello is also currently employed as an area vice president at a publicly traded insurance broker and human resource benefits company, and also co-owns a leadership consulting company based in Carmel, Indiana.

15. **Robert Quattrocchi**, age 63, resides in Schaumburg, Illinois. He has never been associated with a Commission registrant.

16. **Timothy Carey**, age 57, resides in Hanover Park, Illinois. He has never been associated with a Commission registrant.

4

## OTHER RELEVANT ENTITIES

17.     **Verano Holdings Corporation** is a British Columbia, Canada corporation with headquarters in Chicago, Illinois. Verano is in the cannabis industry and operates dispensaries and marijuana growth facilities in 14 states. Verano's common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act. Verano's securities trade under the ticker symbol "VRNOF" on the OTC Markets Group, Inc.

18.     **Goodness Growth Holdings, Inc.** is a British Columbia, Canada corporation with headquarters in Minneapolis, Minnesota. Goodness Growth is in the cannabis industry and operates retail dispensaries and marijuana growth facilities located in New York, Minnesota, and New Mexico. Goodness Growth's securities are registered with the Commission pursuant to Section 12(g) of the Exchange Act. Goodness Growth's securities traded on the OTC under ticker symbol "GDNSF" until July 2024, when it changed its name to Vireo Growth, Inc., and now trades under the ticker "VREOF." On October 14, 2022, Verano publicly announced the termination of its planned acquisition of Goodness Growth.

## FACTS

### Friendship Between Marsico, Pizzello, Quattrocchi, and Carey

19.     During the relevant period, Marsico, Pizzello, Quattrocchi, and Carey were close friends. The friendship between Marsico, Pizzello, Quattrocchi, and Carey dates back to approximately 2015. Pizzello and Quattrocchi have also been friends for approximately 20 years.

20.     Marsico, Pizzello, Quattrocchi, and Carey were all members of the same country club, which Pizzello co-owned (the "Country Club"), and regularly golfed and socialized together. Pizzello and his wife also regularly socialized and traveled with Carey and his wife.

5

21. Among other activities, Marsico, Pizzello, Quattrocchi, and Carey also regularly gambled together.

22. Additionally, Marsico and Pizzello engaged in business together. Marsico referred a viatical settlement contract client to a company co-owned by Pizzello, and Marsico was compensated for the referral in January 2022. Pizzello also invested in Verano through a "friends and family" offering before its initial public offering in 2021.

23. Marsico, Pizzello, Quattrocchi, and Carey regularly communicated with each other via telephone and text messages. Text messages show the closeness of their friendships and familiarity with each other and that they all regularly shared confidences.

24. Given the nature of their friendship, Pizzello, Quattrocchi, and Carey each knew that Marsico worked at Verano, were aware of Marsico's role at Verano, and that Marsico had access to material nonpublic information about Verano.

**Marsico Owed a Duty of Trust and Confidence to Verano**

25. During the relevant period, Marsico – due to his officer position and pursuant to Verano's policies – owed a duty of trust and confidence to Verano to maintain the confidentiality of material nonpublic information that he had obtained during the course of his employment with Verano, including refraining from trading on material nonpublic information and from giving material nonpublic information to others who may trade on the basis of that information.

26. During the relevant period, Marsico was an Executive Vice President at Verano and was responsible for municipal government relations, real estate, and acquiring the proper licenses and approvals to open cannabis dispensaries in various jurisdictions.

27. Marsico had access to material nonpublic information concerning Verano's finances and business plans. He learned this information through, among other means, meetings

6

he attended, and regular communications that he had with other Verano executives. Marsico and Verano's chief investment officer ("CIO") regularly communicated about Verano's projected revenue and earnings. During the fall of 2021, Marsico joined meetings to discuss and plan Verano's script for earnings calls.

28. Verano's policies and procedures in place during the relevant period prohibited Verano employees from: (1) insider trading and tipping of undisclosed material information to third parties; and (2) trading and tipping undisclosed material information about other companies obtained in the course of Verano's business. Verano's employee handbook also prohibited outside disclosure of confidential or proprietary information about Verano, including business or financial information.

29. On February 15, 2021, Marsico signed an acknowledgement that he received Verano's public employee disclosure training deck. The deck provided "acquisitions" as an example of "material" information not to be disclosed outside of Verano and further stated that Marsico, as a Verano employee, must be aware of the rules prohibiting insider trading and "tipping."

**Marsico Traded On the Basis of Material Nonpublic Information About the Planned Acquisition**

30. Goodness Growth is in the cannabis industry, and, during the relevant period, operated retail dispensaries and marijuana growth facilities located in New York, Minnesota, and New Mexico. Verano is also in the cannabis industry, and, during the relevant period, operated dispensaries and marijuana growth facilities in fourteen states.

31. In 2021, Verano was seeking to expand into New York, a coveted market that Verano had not yet entered. At the time, Goodness Growth had one of only ten licenses to cultivate and sell cannabis in New York.

7

32. Marsico had learned through his employment at Verano that the company was interested in expanding into the New York retail cannabis market. In the summer of 2021, Marsico was involved in Verano's retention of a lobbying firm to help Verano retain a license to operate in New York.

33. On April 24, 2021, Goodness and Verano entered into a non-disclosure agreement regarding a potential acquisition of Goodness Growth by Verano.

34. During the Summer of 2021, Goodness Growth and Verano engaged in discussions regarding an acquisition but did not move forward with a deal at that time.

35. On September 2, 2021, Marsico conducted a search of "GDNSF", the Goodness Growth stock symbol, using a search engine, suggesting his awareness by this date of the discussions that had taken place between Verano and Goodness Growth about the possibility of an acquisition.

36. On or around October 22, 2021, Verano and Goodness Growth entered into a second non-disclosure agreement and re-engaged in discussions about a possible acquisition.

37. Between approximately October 19, 2021 and October 21, 2021, Marsico and several representatives from Verano and Goodness Growth attended a cannabis industry conference in Las Vegas.

38. Also in attendance was an investment banker (the "Investment Banker"), who had been hired by Goodness Growth on October 18, 2021 to help it find a suitable company interested in acquiring it.

39. On or around October 20, 2021, while at the conference, the Investment Banker introduced himself to Marsico. Marsico gave the Investment Banker his name and identified himself as a senior executive of Verano. During the conversation, Marsico told the Investment

8

Banker that he worked closely with Verano's Chief Executive Officer ("CEO") and further described his role as a senior executive of the company with high-level knowledge of its dealings. Because of Marsico's description of his role at Verano and relationship with Verano's CEO, the Investment Banker told Marsico that he and his firm had been engaged in a process to solicit bids for the purchase of Goodness Growth. The Investment Banker told Marsico about the benefits of a merger between Goodness Growth and Verano and that he believed Verano was very interested in Goodness Growth. According to the Investment Banker, Marsico responded with something to the effect of, "so a person could make a lot of money if they traded on this information."

40. As of October 2021, Marsico was regularly communicating with several of the Verano officers and employees who were working on the acquisition deal team, including Verano's CEO and founder, co-founder, President, Chief Financial Officer, CIO, and in-house attorney.

41. On November 3, 2021, about two weeks after Verano and Goodness Growth signed the second non-disclosure agreement and had re-engaged in acquisition discussions, Verano's CIO, who was also a member of the acquisition deal team, texted Marsico about Verano's potential acquisition of an existing cannabis company with a New York license. At the time, Verano was simultaneously pursuing Goodness Growth and Cannabis Company A, a privately held cannabis company, both of which had New York cannabis licenses.

42. On November 12, 2021, Verano submitted a preliminary non-binding indication of interest to acquire Goodness Growth in an all-stock transaction. On November 17, 2021, Verano submitted a non-binding indication of interest to acquire Goodness Growth with updated

9

deal terms. The day before, on November 16, 2021, Marsico again searched "gdnsf", the Goodness Growth stock symbol.

43. On November 20, 2021, Verano sent a revised non-binding indication of interest to acquire Goodness Growth, containing additional updated deal terms. Later that day, a special committee of Goodness Growth's board approved Verano's acquisition offer, which required Verano to stop negotiations with Cannabis Company A, and provided 45 days for the parties to negotiate the final terms of the acquisition transaction.

44. Just three days later, Marsico searched "goodness growth holdings shares outstanding" which linked him to a webpage that included stock prices, news, and price quotes for Goodness Growth.

45. Between December 2, 2021 and January 31, 2022, Verano and Goodness Growth conducted due diligence related to the planned acquisition.

46. Just as Verano's due diligence began, on December 2, 2021, Marsico, who had not had a U.S. brokerage account since 2015, opened a U.S. brokerage account. The next day, Marsico transferred $100,000 from his personal bank account to fund this newly opened brokerage account.

47. Despite not having a U.S. brokerage account for over six years, Marsico immediately sought to buy Goodness Growth stock. Between December 2, 2021 and December 7, 2021, before these funds were available for trading, Marsico entered six orders attempting to purchase Goodness Growth stock, which were all rejected by the brokerage firm because his funds were still on hold in the account.

48. Once Marsico's funds were released to his trading account, Marsico immediately began purchasing Goodness Growth stock on numerous days and in significantly large amounts.

10

49. Despite never trading in its stock before, Marsico conducted a continuous buying spree in Goodness Growth Stock in the weeks leading up to the public announcement of the planned acquisition. On 23 separate trading days, beginning on December 8, 2021 through January 28, 2022, Marsico bought a total of 906,934 shares of Goodness Growth stock at a cost of approximately $1.5 million.

50. Marsico funded certain of his purchases of Goodness Growth stock using the proceeds of a $4.2 million loan (net of fees) that he obtained on December 28, 2021 from a private equity firm that was also providing financing to Verano for the planned acquisition. Marsico used a portion of the loan proceeds to fund his newly opened U.S. brokerage account.

51. On January 31, 2022, the Boards of Directors of Goodness Growth and Verano approved the planned acquisition.

52. As of January 31, 2022, Marsico's Goodness Growth stock holdings comprised 39% of his total U.S. brokerage account.

53. On February 1, 2022, before the stock market opened, Verano publicly announced in a press release that it was entering the "coveted New York, Minnesota and New Mexico markets" by acquiring Goodness Growth in an all-stock transaction valued at approximately $413 million.

54. Goodness Growth's stock immediately rose with the release of this news. When the trading day ended on February 1, 2022, the day of the Announcement, Goodness Growth's stock price had risen 41.8% from the prior day's closing price of $1.65 per share to a closing price of $2.34 per share.

55. Based on the price of Goodness Growth's stock at the close of the market on February 1, 2022, Marsico's unrealized gains from his purchase of the 906,934 shares of Goodness Growth totaled $661,549.

56. After the Announcement, Marsico almost immediately began selling his Goodness Growth stock to try to reap the benefits of his insider trading scheme. Between February 4, 2022 and February 22, 2022, Marsico sold 584,467 shares of Goodness Growth stock. By March 24, 2022, Marsico had sold all of his 906,934 shares of Goodness Growth stock. Marsico's realized gains on the sale of his Goodness Growth stock totaled $631,557, calculated on a first in first out basis.

57. On February 15, 2022, FINRA requested from Verano, among other things, a list of all persons knowledgeable about the planned acquisition.

58. On March 22, 2022, the same day that Verano responded to FINRA's request, Marsico conducted a search for "what is insider trading" using a search engine and viewed a Wikipedia page on the topic.

59. On May 26, 2022, FINRA notified Verano that FINRA was seeking to obtain additional information about Marsico's awareness of the planned acquisition before it was publicly announced. Verano asked Marsico to provide a written explanation about his knowledge of the planned acquisition, but Marsico ignored Verano's multiple requests for his written response.

**Marsico Tipped Pizzello, Who Traded Based on Material Nonpublic Information About the Planned Acquisition**

60. On December 21, 2021, during an approximately five-minute phone call, Marsico told Pizzello material nonpublic information that Verano would be acquiring Goodness Growth in the near future. Marsico also told Pizzello to purchase shares of Goodness Growth stock in a

way that would avoid red flags. He also instructed Pizzello to keep his tip confidential and not to tell others.

61. Pizzello did not wait to act on Marsico's tip. On December 21, 2021, while still on the phone with Marsico, Pizzello entered his first order to buy Goodness Growth stock. That order was successfully filled, with Pizzello purchasing 5,000 shares.

62. Later that same morning, Pizzello entered an additional order and bought 10,000 more shares of Goodness Growth stock.

63. Pizzello had never bought Goodness Growth stock before Marsico tipped him.

64. Between December 21, 2021 and January 28, 2022, Pizzello bought a total of 167,398 shares of Goodness Growth.

65. On February 1, 2022, Verano announced that it was acquiring Goodness Growth.

66. Based on the price of Goodness Growth's stock at the close of the market on February 1, 2022, Pizzello's unrealized gains from his purchase of the 167,398 shares of Goodness Growth totaled $124,456.

67. Pizzello did not sell any of his Goodness Growth shares until April 18, 2022. Between April 18, 2022 and October 18, 22, Pizzello sold all but 4,719 of his shares and realized losses of $113,662, calculated on a first in first out basis. As of March 2024, he had not sold his remaining 4,719 shares of Goodness Growth stock.

**Pizzello Tipped Quattrocchi, Who Traded Based on Material Nonpublic Information About the Planned Acquisition**

68. Shortly after getting the tip from Marsico, Pizzello relayed Marsico's tip to his close friend Quattrocchi. On December 21, 2021, Pizzello called Quattrocchi and told him that Verano was going to acquire Goodness Growth and he let Quattrocchi know that Marsico was the source of the information.

13

69. Quattrocchi knew that Marsico worked at Verano and had access to material nonpublic information about Verano.

70. On January 4, 2022, while on the phone with Pizzello, Quattrocchi made his first purchase of Goodness Growth stock. During the approximately 21-minute telephone call with Pizzello, Quattrocchi entered two orders to purchase a total of 6,000 shares of Goodness Growth stock in one of his brokerage accounts.

71. After his call with Pizzello, Quattrocchi entered additional orders and bought an additional 9,000 shares of Goodness Growth stock on January 4, 2022.

72. Quattrocchi had never bought Goodness Growth stock before Pizzello tipped him.

73. After Quattrocchi's initial purchase of Goodness Growth stock on January 4, 2022, he bought an additional 49,107 shares between January 5, 2022 and January 28, 2022, for a total of 64,107 shares.

74. On January 14, 18, 20, and 26, Quattrocchi sold 13,678 shares of his Goodness Growth stock position.

75. On February 1, 2022, Verano announced that it was acquiring Goodness Growth.

76. Within the next 48 hours, Quattrocchi sold all 50,429 shares of his remaining Goodness Growth position. Quattrocchi sold 31,485 of his Goodness Growth shares on February 1, 2022 and the remaining 18,944 shares of Goodness Growth on February 2, 2022.

77. Quattrocchi realized gains of $15,270 from the sale of his 31,485 shares of his Goodness Growth stock on February 1, 2022, calculated on a first in first out basis.

78. Based on the price of Goodness Growth's stock at the close of the market on February 1, 2022, Quattrocchi's unrealized gains from his purchase of the 18,944 shares of Goodness Growth totaled $12,865. Quattrocchi realized gains of $11,622 from the sale of his

18,944 shares of his Goodness Growth stock on February 2, 2022, calculated on a first in first out basis.

**Pizzello Tipped Carey, Who Traded Based on Material Nonpublic Information About the Planned Acquisition**

79. Pizzello also relayed Marsico's tip to his close friend Carey.

80. While Carey and his wife were visiting Pizzello's home in Florida over the New Year's holiday in early January 2022, Pizzello told them that Goodness Growth would be acquired by Verano and that Goodness Growth's stock price could double as a result.

81. Carey understood that Marsico was the original source of the material nonpublic information about the planned acquisition.

82. Carey knew that Marsico worked at Verano and had access to material nonpublic information about Verano.

83. On January 4, 2022, Carey made his first purchase of 12,195 shares of Goodness Growth in his wife's brokerage account.

84. Carey had never bought Goodness Growth stock before Pizzello tipped him.

85. On January 14, 2022, after the stock market closed, Pizzello texted Carey and Quattrocchi a screenshot of Goodness Growth's stock chart for that day which reflected a 5.42% gain followed by a "Let's go" text.

86. On January 31, 2022, Carey bought 875 additional shares of Goodness Growth in a brokerage account jointly held by him and his wife.

87. Between January 4, 2022 and January 31, 2022, Carey bought a total of 13,070 shares of Goodness Growth.

88. On February 1, 2022, Verano announced that it was acquiring Goodness Growth, but Carey did not sell his Goodness Growth stock after the Announcement.

15

89. Based on the price of Goodness Growth's stock at the close of the market on February 1, 2022, Carey's unrealized gains from his purchase of the 13,070 shares of Goodness Growth totaled $9,260. As of the filing of this Complaint, he had not sold any of his shares of Goodness Growth stock.

## CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

90. The Commission realleges and incorporates by reference each and every allegation contained in the paragraphs above.

91. Marsico, Pizzello, Quattrocchi, and Carey each knowingly or recklessly bought Goodness Growth stock while in possession of material nonpublic information about the planned acquisition.

92. Marsico learned material nonpublic information about the planned acquisition through his employment as a Verano executive. Marsico knew or was reckless in not knowing, that the information he possessed concerning the planned acquisition was material nonpublic information.

93. At all relevant times, Marsico had a relationship of trust and confidence with Verano that required him to keep nonpublic information regarding the planned acquisition confidential and to refrain from trading on it. Marsico knew, consciously avoided knowing, or was reckless in not knowing, that he owed a duty of trust and confidence to keep the material nonpublic information he possessed concerning the planned acquisition confidential and to refrain from trading on it. Marsico breached this duty by buying Goodness Growth stock on the basis of material nonpublic information about the planned acquisition. Marsico also breached this duty by tipping Pizzello material nonpublic information about the planned acquisition with the expectation that Pizzello would use the material nonpublic information to purchase Goodness

Growth stock. Marsico tipped Pizzello material nonpublic information about the planned acquisition in exchange for a personal benefit by making a gift of the information to his close friend.

94. Pizzello, Quattrocchi, and Carey each knew, consciously avoided knowing, or were reckless in not knowing, or should have known, that the information about the planned acquisition had been disclosed by Marsico in breach of a duty of trust and confidence for a personal benefit. They each traded on the basis of the information despite knowing, consciously avoiding knowing, or being reckless in not knowing, that it was material and nonpublic. Pizzello tipped Quattrocchi and Carey material nonpublic information about the planned acquisition in exchange for a personal benefit by making a gift of the information to his close friends.

95. By engaging in the acts and conduct alleged herein, Marsico, Pizzello, Quattrocchi, and Carey each, directly or indirectly, in connection with the purchase or sale of a security, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange:

   a. employed a device, scheme, or artifice to defraud; and/or

   b. made an untrue statement of material fact, or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

   c. engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon any person.

96. By reason of the foregoing, Marsico, Pizzello, Quattrocchi, and Carey each violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**PRAYER FOR RELIEF**

THEREFORE, the Commission respectfully requests that this Court:

A.      Permanently restrain and enjoin Marsico, Pizzello, Quattrocchi, and Carey from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5] by (i) buying or selling a security of any issuer, on the basis of material nonpublic information, in breach of a fiduciary duty or other duty of trust or confidence that is owed directly, indirectly, or derivatively, to the issuer of that security or the shareholders of that issuer, or to any other person who is the source of the information; or (ii) by communicating material nonpublic information about a security or issuer, in breach of a fiduciary duty or other duty of trust or confidence, to another person or persons for purposes of buying or selling any security.

B.      Prohibit Marsico, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

C.      Order Marsico, Pizzello, Quattrocchi, and Carey each to pay disgorgement of ill-gotten gains and prejudgment interest thereon pursuant to Sections 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. § 78u(d)(5) and (d)(7)];

D.      Order Marsico, Pizzello, Quattrocchi, and Carey each to pay a civil penalty pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1];

E.      Retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court; and

F.      Grant such further relief as the Court deems just and proper.

Dated: January 16, 2025        Respectfully submitted,

By: */s/ Ashley E. Dalmau Holmes*
UNITED STATES SECURITIES
AND EXCHANGE COMMISSION
Ashley E. Dalmau Holmes (DalmauHolmesA@sec.gov)
Timothy Leiman (LeimanT@sec.gov)
Richard G. Stoltz (StoltzR@sec.gov)
175 W. Jackson Blvd., Suite 1450
Chicago, Illinois 60604
Phone:     (312) 353-3790
Facsimile:  (312) 353-7398